34 So.2d 614

## LIGHTFOOT v. STATE.

### 5 Div. 232.

Court of Appeals of Alabama.

Feb. 3, 1948.

Rehearing Denied Feb. 24, 1948.

Holley, Milner & Holley, of Wetumpka, for appellant.

A. A. Carmichael, Atty. Gen., and Richard S. Brooks, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This appellant was indicted for manslaughter in the first degree growing out of a collision between a truck driven by appellant and a Chevrolet automobile in which Willie Melvin Shurum was a passenger. Two other young men riding in the car also died as a result of this collision.

The jury found appellant guilty of manslaughter in the second degree and fixed his punishment at hard labor for Coosa County for a term of twelve months.

In its judgment the court fixed the punishment at twelve months hard labor in the state penitentiary for the use of Coosa County. That part of the judgment attempting to sentence the appellant to twelve months hard labor in the penitentiary of the state is erroneous. In all cases in which the imprisonment or sentence to hard labor is twelve months or less, the party must be sentenced to imprisonment in the county jail, or to hard labor for the

county. Section 325, Title 15, Code of Alabama 1940, and numerous cases annotated thereunder.

Other than the appellant, there were no eye witnesses to this collision so lamentable in its results.

In attempting to establish an offense the state was compelled to rely upon the testimony of witnesses pertaining to physical evidence, such as debris, parts of motor vehicles, scars on the roadway, etc., observed in the vicinity of the locus of the wreck. The testimony of the state's witnesses presents a contradictory and irreconcilable set of facts as to these conditions. Several diagrams of the locus were used by the defense in cross examination, and introduced in evidence.

The evidence presented by the state tends to show that in the vicinity of this collision Highway No. 9 runs roughly north and south. Angling sharply into Highway from the Southwest is another road. Immediately opposite the intersection of these two roads is a dirt road leading off almost due east.

E. L. Shurum, father of the deceased, a boy aged 15, and for whose death this appellant is being prosecuted, testified that he heard the collision and went to the scene in a few minutes. He found his boy lying on the porch of a small house just off the highway. The body of Clemmons Dean, driver of the Chevrolet, was also on the porch. Young Shurum was conscious, and Mr. Shurum carried him to a hospital in Alexander City, but he died at the hospital about forty minutes after the collision.

Mr. Shurum observed that the automobile his son was alleged to have been in was about twenty feet down the highway, toward Equality, from the intersecting road that the car came out of. He also saw that the black top surface of the highway was scarred from this intersection on toward the south, and pieces of terra cotta pipe with which the truck was loaded were lying on the road.

Back north of the intersection about forty or fifty feet Mr. Shurum saw some oil that "had run out into the grass" and some glass. Near the place where this oil was observed, which was on the left of the road facing south, a peach tree stood near the highway. A hub cap from the Chevrolet was near this peach tree. Two hub caps were off the automobile, but Mr. Shurum never saw but one of them at the time of his observation. Two of the pipes from the truck were on the ground near the automobile which was south of the intersection at the time it was observed by Mr. Shurum. The truck, after the collision, had gone some 250 feet south of the automobile, and had stopped off on the east side of the highway. Mr. Shurum further testified that he had heard the motor of the truck as it proceeded down the highway for about a minute before the collision and that it was "running fast."

Mr. Mack Thomas went to the scene of the wreck the morning after it occurred. Much of this witness' testimony is difficult to follow as much of it refers to a diagram apparently on the floor.

The first thing Mr. Thomas noticed was a spring shackle off a truck "laying out there opposite a peach tree and there was a big wad of oil. The oil was to the left of the center of the road facing south, and part of it had run below this spring shackle, didn't run quite off the highway."

The record also shows the following:

"Q. How large a spot of oil was that? A. Good size spot, I didn't measure it.

"Q. About how far was that from where this road intersects the highway? A. From here to here (indicating) 274 feet.

"Q. 274 feet from the point of intersection of that road towards Nicksburg? A. Yes, sir, and also found a hub cap out there off the boys' car.

"Q. Just one hub cap? A. Yes, sir."

As to other observations by Mr. Thomas the record shows the following:

"Q. What did you observe on this highway where you say the hub cap and oil was on down to where this truck stopped? A. Right here (indicating) at this intersection one of the big pipes fell off right here (indicating) and knocked a great big hole in the black top. It looked like the

lick might have occurred there. It was where a big pipe fell off.

\* \* \* \* \* \*

"A. Right here (indicating) a pipe fell off right there at the intersection and there was a big hole in the ground.

"Q. In the black top? A. A part of the pipe was laying there (indicating) and we cleared the highway of the pipe, broken piece of pipe laying on the edge of the highway (indicating) and right back here (indicating) another pipe fell off and knocked another big hole in the black top.

"Q. On down towards the truck what did you find? A. He was dragging on down here (indicating), his front wheels were dragging and his front end was knocked under his truck and he was dragging all the way down (indicating)."

Mr. Thomas further testified that the truck tracks could be observed from where it left the road at the peach tree, which according to his testimony was 274 feet north of the intersection, on down to where the truck stopped about the same distance south of the intersection.

J. W. Golden, a State Highway Patrolman, arrived on the scene of the wreck about an hour after its occurrence.

He found both vehicles pretty well torn up. As to the car "the left side was torn off beginning at the left headlight down the side of the car"—and as to the truck "the left front headlight and left front fender was torn off."

Mr. Golden arrested the appellant and was told by appellant that he was "going approximately forty miles an hour just before they hit and he slowed down to approximately thirty-five miles an hour just as he hit, he was trying to stop the truck."

On cross examination Mr. Golden testified that he found a hub cap, a spring shackle, glass and concrete pipes of the type the truck was carrying in the highway from a point at about the middle of the intersection on down south toward the truck. He cleared the highway of this debris as quickly as possible, and threw the stuff off the highway. He also noticed scars in the surface of the highway beginning at about the middle of the intersection in the middle of the highway. Mr. Golden said he looked north of the intersection but saw nothing north of the intersection.

Mr. Golden further testified that he could and did back track the truck from its resting place at the left side of the road facing south back to the point of impact. These tracks indicated that the truck was on the right side of the road travelling south at the point of impact, which was practically in the middle of the intersection. This witness traced the progress of the truck on a diagram of the locus submitted in evidence as an exhibit and according to this diagram the truck after the collision, veered to the left and ran into the left shoulder of· the road some distance south of the intersection. The truck could not be tracked back beyond the point of impact.

This witness gave additional testimony on cross examination as to the statement given him by appellant, and we now quote from the record:

"When I questioned Willie as to what happened there he said he was coming down the highway and as he was coming around that curve shown in the picture approaching the intersection he saw this car back up the dirt road, the old Nicksburg Road and as he continued to go down the road he blowed his horn several times, and as he got closer he could tell the car was slowing down, and he said just as the car got up to the intersection it looked like it was coming to a complete stop; he said he was just moving along and he had let up off of the accelerator, up off the gas pedal, and as he got up close to the intersection he saw that the car was slowing down and he mashed his accelerator or gas pedal down to pick up speed and just as he mashed the accelerator down it seemed, the car seemed to have jumped out in front of him. That is the statement he made."

Mr. C. L. Dean, father of one of the boys killed in this wreck, testified that he observed the locus of the wreck the morning after. He observed an oil spot, glass and spring shackle on or near the left side of the road facing south. A peach tree was near the area he found this material, and a hub cap off the car was near the peach tree. He would say he found these things fifty or sixty feet north of the inter-

section. About ten feet south of the oil spot he noticed a hole gouged in the surface of the road on the left side facing south.

Paul Dunlap visited the scene of the wreck about an hour after its occurrence and also the next morning.

He testified he saw an oil spot and glass in the road near the peach tree which he estimated to be 240 feet north of the intersection.

According to this witness the truck left the highway north of the intersection after the collision.

He also testified he saw a hole in the highway made by a concrete pipe, indentation being in the middle of the road and about twenty feet south of the oil spot.

This oil spot was about the size of a man's hat, and according to this witness about a foot and a half from the center line of the highway on the left side facing south, and not near the edge of the highway.

This witness saw no holes dug in the highway south of the one observed by him up near the oil spot.

There were no signs on the pavement near the intersection by which he could back track the truck.

Bennett Tinsley went to the scene of the wreck the morning after it occurred. This witness made certain measurements with a steel tape and otherwise observed the scene.

He saw an oil spot about 150 feet north of the intersection, near a peach tree. This oil spot according to this witness was about two feet from the left edge of the pavement facing south.

This witness also observed a hole dug in the surface of the road and according to him this indentation was located at about the middle of the intersection, to the right of center facing south.

For the defense the appellant testified in his own behalf. His testimony was to the effect that he was driving south on Highway No. 9 late on the afternoon of 11 May 1947. He was familiar with the highway in the vicinity of the wreck having often driven it. When within about 300 yards of the intersection, and driving at a speed of forty miles per hour, he saw the Chevrolet automobile approaching the highway from the dirt road. According to this witness "When I saw this car coming I blowed the horn several times and he kept coming. I dimmed my lights and he dimmed his lights, then he throwed them on bright and when he got to the intersection he slowed down a bit, then it looked like this car jumped in the road."

The appellant further testified that at the time of the collision his speed was about thirty-five miles per hour; that the collision happened at about the middle of the intersection and on his right hand side of the road; that the left front of the truck struck the left front of the automobile.

The appellant also introduced a number of character witnesses, several of whom testified not only to his general good character, but also that his reputation as a careful and competent truck driver was good.

"Manslaughter in the second degree is defined as the unlawful killing of another human being, without malice and without the intent to kill or to inflict the injury resulting in death, but accidentally committed by the accused while he was doing an unlawful act amounting to a misdemeanor, or accidentally committed by the accused while he was doing a lawful act, but in a grossly negligent or improper manner." Jones v. State, 21 Ala.App. 234, 109 So. 189, 191; Wilson v. State, 32 Ala.App. 591, 28 So.2d 646.

We find no evidence in the record from which the jury could have reasonably inferred that the truck was being driven at a speed violative of Section 5, Title 36, Code of Alabama 1940, imposing restrictions as to motor vehicles used on the highways of this state.

Criminality in this case, if any, must stem from a violation of Section 9, Title 36, Code of Alabama 1940, making it a misdemeanor for a person not to drive on the right half of a highway, or from evidence from which the jury could infer under the required rule that appellant acted "in a grossly negligent or improper manner."

The state must rely entirely on circumstantial evidence to sustain a conviction. This is not unusual. Nor is it unusual to find irreconcilably conflicting testimony presented by the two adversaries in a court proceeding. It is unusual, however, to find one side presenting witnesses whose testimony is as varied and conflicting as is the state's evidence in this case.

■ While it is settled that circumstantial evidence will sustain a conviction, yet such evidence should be weighed with care, Gunn v. State, 24 Ala.App. 494, 136 So. 870, and convictions based on such evidence should be carefully scrutinized by the judiciary. Dutton v. State, 25 Ala.App. 472, 148 So. 876.

It should be noted that Mr. Golden, who has been a State Highway Patrolman for three years, and who was a deputy sheriff for three years prior to going with the state patrol, testified unequivocally that he arrived on the scene of this wreck within an hour after it had happened. That he proceeded to clear the highway of the debris caused by the wreck, and that none of this debris was north of the intersection, nor was the surface of the road scarred north of the intersection. He further testified that he could back track the truck from its resting place after the wreck and that the truck was on the right hand side of the road at the point of impact, and about the middle of the intersection, and further that the truck could not be back tracked beyond the point of impact.

Mr. Shurum also testified that the indentations he observed in the road were from the intersection on south.

Mr. Mack Thomas testified he saw a hole in the road at the intersection where one of the pipes had fallen from the truck and "It looked like the lick might have occurred there."

The only indentation observed in the road by Mr. Tinsley, who observed the locus to the extent of making measurements with a steel tape, was a hole dug in the surface of the road at about the middle of the intersection, and to the right of the center of the road facing south. This was the direction in which the truck was travelling.

Since Mr. Golden testified that he had thrown the spring shackle and hub cap off the highway from where he found them south of the intersection the testimony regarding the finding of these objects at a position variously stated to be from 40 to 250 or 260 feet north of the highway loses much if not all of its cogency.

The oil spot mentioned by several witnesses for the state was placed by them at various distances north of the intersection, and on the left edge, where it had run onto the grass (Shurum); on the left side of the road, but "didn't run quite off the highway" (Thomas); about a foot and a half from the center of the highway, and covering an area about the size of a man's hat (Dunlap). Except for Mr. Shurum's testimony that the oil had run into the grass there is no evidence tending to show how long this oil may have been on this well travelled highway. To give significance to the testimony as to the oil spot observed we must infer that it resulted from this collision, and further must infer that it came from the truck. There is not a scintilla of evidence on which to base an inference that this oil came from the truck rather than from the car.

■ Be that as it may, it is our conclusion after careful consideration of the evidence presented in this case that even the preponderance and weight of the evidence presented by the state tends to show that this collision occurred at the intersection. Nor is the evidence sufficiently strong and cogent to base a conclusion thereon that this collision resulted from or was caused by appellant while in the commission of a misdemeanor, or while doing a lawful act in a grossly negligent or improper manner, nor is the evidence in our opinion sufficiently cogent to overcome this appellant's presumption of innocence cloaking him during this proceeding.

The tragic and fatal result of this collision are unbounded. Emotion however has no place in determination of criminality. In our opinion there is too great a chance that an injustice may be done this appellant if this conviction be sustained in light of the evidence submitted. Submission of the

issues to another jury will furnish an opportunity of clarifying and removing the doubtful character of the picture presented by this record.

It is our conclusion therefore that the lower court erred in denying appellant's motion for a new trial on the grounds that the verdict was contrary to the evidence, contrary to the law and the evidence, and contrary to the great preponderance of the evidence.

This cause is therefore due to be reversed and remanded, and it is so ordered.

Reversed and remanded.